UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THERESA A. ANDERSON,

    *Plaintiff*,

*v*.

COMMISSIONER OF
SOCIAL SECURITY,

    *Defendant*.

_____/

CASE NO. 2:18-12008

DISTRICT JUDGE NANCY G. EDMUNDS

MAGISTRATE JUDGE PATRICIA T. MORRIS

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT
(R. 17, 21)

## I.  RECOMMENDATION

   In light of the entire record in this case, I suggest that substantial evidence does not support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (R. 17), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 21), be **DENIED**, and this case be **REMANDED** under sentence four of 42 U.S.C. § 405(g).

## II. REPORT

### A.  Introduction and Procedural History

   This is an action for judicial review of a final decision by the Commissioner of Social Security denying Plaintiff Theresa Ann Anderson's claim for disability benefits. (R. 1). Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of

1

Reference, this case was referred to the undersigned Magistrate Judge. (R. 6). Currently before the court are Plaintiff's and Defendant's cross-motions for summary judgment (R. 17, 21). Plaintiff has also filed a response to Defendant's motion. (R. 23).

Previously, Plaintiff had filed for disability and testified at a hearing on April 12, 2011. (R. 14 at PageID.120). Administrative Law Judge (ALJ) John Dodson found she had the severe impairments of malignant neoplastic breast cancer and an affective disorder, and she lacked the residual functional capacity (RFC) to perform work activities in an ordinary work setting on a regular and continuing basis. (*Id.* at PageID.122). Thus, as of May 16, 2011, the ALJ concluded she had been under a disability since December 29, 2009; he recommended a continuing disability review in 24 months, because "[m]edical improvement is expected with appropriate treatment." (*Id.* at PageID.125).

After a determination was made that Plaintiff's disability had ended on May 19, 2014, (*id.* at PageID.126), Plaintiff requested reconsideration, (*id.* at PageID.135). In the decision at issue here, the ALJ found that Plaintiff's disability had ended on May 19, 2014, and she had not become disabled again since that date. (*Id.* at PageID.75). The Appeals Council denied her request for review. (*Id.* at PageID.53-57). This action followed. (R. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted to determining solely whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (internal quotation

marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.*

### C. Framework for Disability Determinations

When, as here, a recipient of disability benefits challenges the cessation of benefits, the central issue is whether the recipient's medical impairments have improved to the point where she is able to perform substantial gainful activity. 42 U.S.C. § 423(f)(1); *Kennedy v. Astrue*, 247 Fed. Appx. 761, 764 (6th Cir. 2007). Whether an individual is entitled to continued benefits depends on whether "there has been any medical improvement in [the person's] impairment(s) and, if so, whether this medical improvement is related to [the person's] ability to work." 20 C.F.R. §§ 404.1594(a), 416.994(b) (eff. Aug. 24, 2012 to Mar. 26, 2017).

The implementing regulations incorporate many of the standards set forth in regulations governing initial disability determinations. *See* 20 C.F.R. §§ 404.1594(b)(5), 404.1594(f)(7). The difference, however, is that the ultimate burden of proof lies with the Commissioner in termination proceedings. *Id.*; *Kennedy, supra*; *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991).

The cessation evaluation process is a two-part process. *See Kennedy*, 247 Fed. Appx. 764–65. The first part of the process focuses on medical improvement. *Id.* at 764. The implementing regulations define "medical improvement" as "any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled." *Id.* at 764–65 (citing 20 C.F.R. § 404.1594(b)(1)). "A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with [the person's] impairment(s)." 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1). If there has been a decrease in the severity of the impairments since the favorable decision, the medical improvement is related to the individual's ability to work only if there has been a corresponding 'increase in [the claimant's] functional capacity to do basic work activities . . . .'" *Kennedy*, 247 F. App'x. at 765 (quoting 20 C.F.R. § 404.1594(b)(3)).

The second part of the cessation analysis focuses on whether the person can engage in substantial gainful activity. *Kennedy*, 247 F. App'x at 765. The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations                that                govern                initial                disability

determinations. *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7)). The difference is that "the ultimate burden of proof lies with the Commissioner in termination proceedings." *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego*, 940 F.2d at 944). An increase in the claimant's functional capacity will lead to a cessation of benefits only if, as a result, the claimant can perform her past work or other work that exists in significant numbers in the national economy. 20 C.F.R. §§404.1594(f)(7), (8), 416.994(b)(5)(vii), (viii).

In deciding whether a recipient's entitlement to disability benefits has ended, the Commissioner uses the eight-step sequential evaluation process outlined in 20 C.F.R. §§ 404.1594(f)(1)-(8) and 416.994(b)(5)(i)-(viii). *Kennedy*, 247 F. App'x at 764. The steps are:

(1) Are you engaging in substantial gainful activity? If you are . . . we will find disability to have ended . . . .

(2) If you are not, do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of this subpart? If you do, your disability will be found to continue.

(3) If you do not, has there been medical improvement as defined in paragraph (b)(1) of this section? . . .

(4) If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1) through (4) of this section . . . .

(5) If we found at step (3) that there has been no medical improvement or if we found at step (4) that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (d) and (e) of this section apply. . . .

(6) If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe . . . .

(7) If your impairment(s) is severe, . . . . we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work you have done in the past. If you can do such work, disability will be found to have ended.

(8) If you are not able to do work you have done in the past, we will consider whether you can do other work given the residual functional capacity assessment . . . . If you can, we will find that your disability has ended. If you cannot, we will find that your disability continues.

20 C.F.R. §§ 404.1594(f), 416.994(b)(5).

There is no presumption of continuing disability. *Kennedy*, 247 Fed. Appx. at 764 (citing *Cutlip v. Secretary of Health and Human Services*, 25 F.3d 284, 286–87 n. 1 (6th Cir. 1994)). Instead, the Commissioner applies the above procedures to determine whether the claimant's disability has ended and if she is now able to work. *Id.*

### D. ALJ Findings

Following the eight-step sequential analysis, the ALJ found that Plaintiff's disability had ended on May 19, 2014, and she had not become disabled again since then. (R. 14 at PageID.75). First, the ALJ found that Plaintiff had not been engaging in substantial gainful activity. (*Id.* at PageID.65). The ALJ determined that medical improvement occurred on May 19, 2014. (*Id.* at PageID.67). Since that date, the impairments present at the time of the comparison point decision (CPD) had decreased in medical severity to the point where Plaintiff had the residual functional capacity (RFC) to perform a full range of work activity. (*Id.*).

6

Since May 19, 2014, however, Plaintiff had had the following medically determinable impairments: fibromyalgia; hypothyroidism; migraine headaches; a history of breast cancer and treatment, in remission; and anxiety. (*Id.* at PageID.65). She had not had an impairment or history of impairments that met or medically equaled the severity of a listed impairment. (*Id.*).

Based on Plaintiff's more recent severe impairments—namely, fibromyalgia, hypothyroidism, migraines, and anxiety—the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), but she could occasionally climb stairs and ramps; never climb ropes, ladders, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; occasionally reach overhead. (*Id.* at PageID.68). Further, she was limited to no concentrated exposure to unprotected heights, vibrating tools, or moving machinery; only simple, routine, repetitive tasks involving little judgment and that could be learned in a short period of time; and only occasional contact with the public, coworkers, and supervisors. (*Id.*). In conclusion, the ALJ determined that Plaintiff's disability had ended on May 19, 2014, and Plaintiff had not become disabled again since that date. (*Id.* at PageID.75).

### E. Administrative Record

#### 1. Medical Evidence

I have thoroughly reviewed the medical record. In lieu of summarizing Plaintiff's medical history here, I will reference and provide citations to the record as necessary in my discussion of the parties' arguments.

#### 2. Application Reports and Administrative Hearing

7

### i.  Plaintiff's March 2014 Function Report

Plaintiff completed a function report on March 22, 2014.[1] (R. 14 at PageID.248-55). She explained that she could not stand or walk "all day" because her legs would swell and she would have numbness and tingling in her arms and feet. (*Id.* at PageID.248). She could not lift or carry things like she used to because of her upper body pain and numbness, especially the pain in her neck and skull. (*Id.*). Migraines often forced her to lie down. (*Id.*). She was constantly tired, and had to take breaks often when doing light housework due to her fibromyalgia and chronic fatigue post-chemotherapy. (*Id.*).

On a typical day, Plaintiff got her kids ready for school and dropped them off, then took a nap, did some light housework, fixed her kids an after-school snack, rested, helped her kids with homework, and went to bed. (*Id.* at PageID.249). She also took care of pets by giving them food and water and letting them out. (*Id.*).

She found it hard to fall asleep because of the tingling and numbness in her legs and arms, and she woke up throughout the night. (*Id.*). In the mornings, she woke up feeling as if she had not slept at all. (*Id.*). Additionally, some of her medications caused drowsiness. (*Id.* at PageID.255). Though her medications helped her manage the pain, she still had neck, head, skull, and body pain daily. (*Id.*).

Plaintiff had no problems bathing, shaving, feeding herself, or using the toilet. (*Id.* at PageID.249). She did not wear tight clothes due to her nerve issues, and she had to take

---

[1] Plaintiff also completed another function report on July 14, 2014, (R. 14 at PageID.292-99); because it is largely duplicative of her March 2014 function report, I will not summarize it here.

breaks while doing her hair if her arms were bothering her. (*Id.*). No reminder was necessary for her to take care of personal needs or grooming, but she set a phone alarm to remind her to take her medications. (*Id.* at PageID.250).

For food, Plaintiff prepared meals daily, usually meat and a vegetable or fruit—for example, salmon, broccoli, and watermelon—though once in a while she was too tired and would get takeout. (*Id.*). She did not enjoy cooking as much since onset. (*Id.*).

Around the house, Plaintiff did cleaning, laundry, and snowblowing for an estimated 30 to 45 minutes, a couple days per week. (*Id.*). She needed help carrying laundry up or down the stairs because she had fallen twice on the stairs before. (*Id.*). And she had had to stop cutting grass because it made her light-headed and caused numbness in her arms. (*Id.* at PageID.251). She had to put things off until she was not as tired or in pain. (*Id.* at PageID.249).

She was able to drive, and could go out alone walking or driving. (*Id.* at PageID.251). Every two or three weeks, she spent an hour or two shopping for groceries; her kids helped her carry them in. (*Id.*). Plaintiff remained able to pay bills, count change, handle a savings account, and use a checkbook or money orders, though she found she now counted slower and had to write things down and double-check everything. (*Id.* at PageID.251-52).

In terms of hobbies, Plaintiff enjoyed reading as often as she comfortably could, usually for half an hour to 45 minutes at a time. (*Id.* at PageID.252). But she did not read when she had a migraine or felt too tired because reading would make things worse. (*Id.*).

Plaintiff did not like talking on the phone, but did enjoy sitting and chatting over coffee about once a week. (*Id.*). On a regular basis, she went to the grocery store, gas station, and doctor's office. (*Id.*). She had no problems getting along with family, friends, neighbors, or others, but did not spend as much time with friends as she used to because she lacked energy. (*Id.* at PageID.253). She got along well with authority figures, and had never been fired or laid off due to problems getting along with others. (*Id.* at PageID.254).

Her impairments affected her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, complete tasks, concentrate, and use her hands. (*Id.* at PageID.253). She explained that she could lift 30 pounds; her hands sometimes went numb and tingled; squatting or bending triggered migraines; standing caused swelling, numbness, and tingling in her legs after 15 minutes; reaching overhead hurt her neck; walking sometimes caused her legs and hands to swell; sitting hurt her tailbone; she couldn't kneel due to knee surgery; and completing tasks was difficult because of her fatigue and reduced concentration. (*Id.*). By Plaintiff's estimate, she could walk for 30 to 40 minutes before needing to rest for 15 minutes. (*Id.*). She could pay attention for a few minutes at a time and finish what she started if she was not too tired. (*Id.*). She could follow spoken instructions "OK," so long as they were not too long or detailed, and found that she skipped a lot of words when reading written instructions, so she had to double-check things. (*Id.*).

Further, Plaintiff worried about things a lot, and had a hard time handling changes in routine due to chronic fatigue. (*Id.* at PageID.254).

### ii.  Plaintiff's July 2014 Function Report

Plaintiff completed another function report several months later, in July 2014. (R. 14 at PageID.292-99). She explained that she was "always in pain," due to persistent muscular pain, fibromyalgia, hypothyroidism, peripheral neuropathy, dependent edema, neck pain, and migraines. (*Id.* at PageID.292). She also suffered from chronic fatigue and malaise, memory issues, and depression. (*Id.*).

Plaintiff's answers about her daily activities were largely unchanged: on a typical day she fed her children and helped them with homework, went to the doctor or ran an errand or two, and then was exhausted enough to need a nap. (*Id.* at PageID.293). She also took care of pets by feeding them and letting them outside, with help from her kids. (*Id.*). Personal care presented no difficulties, except that she could not blow dry her hair because her arms would tingle and go numb. (*Id*).

She reiterated that she could do laundry once a week and light cleaning for 30 to 45 minutes once or twice a week, though her kids helped her carry the laundry basket and with other chores. (*Id.* at PageID.294). With help from her kids, she shopped for groceries once a week, taking no more than an hour to do so. (*Id.* at PageID.295). She left the house at least a few times a week, either driving or walking. (*Id.*).

For hobbies, she enjoyed reading, but she could not concreate on reading if she had a migraine. (*Id.* at PageID.296). If she was not exhausted, she would have coffee and chat with others about once a week. (*Id.*). But when she did make it to social activities, she felt even more exhausted afterward, and it could take her multiple days to recover. (*Id.* at PageID.297). Stress further exacerbated her exhaustion, depression, and chronic fatigue, but she handled changes in routine "mostly OK." (*Id.* at PageID.298).

11

Plaintiff had to set alarms on her phone to remind her of appointments and to take her medications. (*Id.* at PageID.294, 296). And as before, Plaintiff noted that some of her medications made her drowsy and sleepy. (*Id.* at PageID.299).

This time, Plaintiff indicated that her impairments affected her abilities to lift, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, and use her hands. (*Id.* at PageID.297). She estimated she could lift no more than 25 pounds, and to waist level only. (*Id.*). Bending triggered migraines, sitting caused her feet and arms to go numb, and reaching made her arms numb and tingly. (*Id.*). Talking occasionally caused increased exhaustion. (*Id.*). She could walk 30 to 45 minutes, so long as she was not experiencing swelling and was not too tired, and then she needed to rest about 15 minutes. (*Id.*).

She had to reread instructions several times to understand them, and had noticed that in conversations she often forgot the topic or left off mid-sentence. (*Id.*). Her mind wandered after a couple of minutes. (*Id.*). And handling money now took longer because Plaintiff now had to double- or triple-check everything. (*Id.* at PageID.295-96). But she was able to finish what she started most of the time, so long as she took several breaks. (*Id.*).

### iii.  Third-Party Function Report

Plaintiff's mother, Katherine Ann Louis, also completed a function report, dated April 19, 2014. (R. 14 at PageID.270). She visited with Plaintiff biweekly, ate dinner with her, and talked. (*Id.*). Her mother echoed Plaintiff's statements, saying she could not work due to excessive tiredness, nausea, headaches, muscle pain, swelling, difficulty

12

concentrating, and dizziness. (*Id.*). She reported that Plaintiff had to take naps throughout the day, in between doing things with her children. (*Id.* at PageID.271). Plaintiff had no problems with her personal care, and simply took her time. (*Id.*).

Plaintiff's mother largely corroborated her own function report, indicating that she needed a cell phone alarm to remember to take her medications, cooked meals daily for 30 minutes to an hour, did light cleaning around the house, shopped for groceries, and could read for about a half hour. (*Id.* at PageID.272-74). Plaintiff's daughter did the yardwork because it caused pain, numbness, and shaking in Plaintiff's arms and hands. (*Id.* at PageID.273). Plaintiff's mother confirmed that Plaintiff could drive, but added that her neck made driving uncomfortable, though she could get to her destination. (*Id.* at PageID.273). Plaintiff visited with friends or family about once a week, but fatigue kept her from socializing as often as she had before. (*Id.* at PageID.274-75).

Similarly to Plaintiff, her mother indicated that her impairments affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, remember, complete tasks, concentrate, and use her hands, for essentially the same reasons as Plaintiff had described. (*Id.* at PageID.275). She thought Plaintiff could walk 45 minutes to an hour if she was not experiencing swelling, and lift up to 25 pounds. (*Id.*). How long she could pay attention depended on whether she had a migraine, and her sleep patterns. (*Id.*). She followed written instructions "OK," and spoken instructions "OK" as long as they were not too detailed. (*Id.*).

Plaintiff's mother thought she was "uneasy" with stress, and could handle changes in routine, but with some agitation. (*Id.* at PageID.276).

13

### iv.  The April 2011 Hearing

An administrative hearing was held in Plaintiff's case on April 12, 2011, before ALJ John Dodson. (R. 14 at PageID.82). Plaintiff testified that her medi port had been removed on March 7. (*Id.* at PageID.85). She said her doctor had wanted to put her on Tomaxapen, but the side effects "were extremely scary" to her. (*Id.*). She was still experiencing fatigue, for which she was not taking anything. (*Id.* at PageID.85-86). Vocational Expert (VE) Zavka testified briefly that Plaintiff's prior relevant work was as a store manager, which was skilled light work. (*Id.* at PageID.86).

### v.  The June 2017 Hearing

The most recent administrative hearing in Plaintiff's case was held on June 14, 2017, before ALJ Timothy C. Scallen. (*Id.* at PageID.89). Non-attorney representative Daniel C. Smith appeared on her behalf. (*Id.* at PageID.91).

Plaintiff reported that ever since chemotherapy, she had suffered from chronic migraines that struck three to four times a week, lasted five to six hours, and caused nausea and throbbing, stabbing pain in her eye and neck. (*Id.* at PageID.93-95). When she had a migraine, Plaintiff had to lie down in a dark room and take medications. (*Id.* at PageID.94-95). The pain reached up to a 9 out of 10; she had called the doctor crying before, and "wanted to go to the emergency room at times." (*Id.* at PageID.94).

In addition, Plaintiff had daily peripheral neuropathy, which caused numbness and tingling in her arms, legs, feet, and hands. (*Id.* at PageID.95). The nerve pain woke her up most nights. (*Id.*). She also reported muscle spasms. (*Id.*).

14

Next, Plaintiff explained that after standing for about 10 minutes, her ankles and legs swelled painfully "from the veins being insufficient." (*Id.* at PageID.96). And she had "all over body muscle pain, joint pain," including neck and back pain, for which she saw a chiropractor. (*Id.*).

As for her mental impairments, Plaintiff had been seeing therapist Yolanda Tolbert regularly for about two years for depression, anxiety, and panic attacks. (*Id.* at PageID.98). Her symptoms included feeing worried a lot, racing thoughts, and a lack of motivation. (*Id.*).

By Plaintiff's estimate, she could lift about 10 pounds "without sparking off a migraine," and sit about 10 minutes before nerve pain and swelling set in. (*Id.* at PageID.97-98). At that point in the hearing, she said, she was in pain. (*Id.* at PageID.98). Due to the same issues, she could stand about 10 minutes, but she thought she could walk comfortably for 30 to 40 minutes. (*Id.* at PageID.98). Going up and down stairs gave her shortness of breath; she did not have respiratory issues, did not smoke, and did have to climb stairs to get to her bedroom at home. (*Id.* at PageID.99-100).

Stooping, kneeling, crouching, and crawling caused her pain because "it's crunching the veins and crunching the blood flow." (*Id.* at PageID.100). Her vein issues had also started after chemotherapy, she explained, and she had repeatedly complained to her oncologist about the swelling. (*Id.*). Because the swelling kept worsening, Plaintiff had had a few different treatments done, including shots, but the problems persisted. (*Id.*). She planned to return in October and ask if there was anything else that could be done. (*Id.* at PageID.101).

She had no issues using her hands to grip, grasp, or hold things, or making a fist. (*Id.*). She had "a little bit of an issue" extending her arms overhead, because it "kind of sets [her] nerves . . . [o]n a frenzy." (*Id.* at PageID.101-02).

At home, Plaintiff lived with her two daughters, ages 15 and 13. (*Id.* at PageID.102). She was able to take care of her personal care needs, such as bathing and getting dressed. (*Id.*). And she could do household chores, but needed to take breaks—for example, after doing dishes for about 10 minutes, her legs started to bother her, so she would take a break. (*Id.*). Her body would also start to hurt. (*Id.*). She was able to do light cooking and her own laundry, to clean up after their three dogs, and to drive. (*Id.* at PageID.102-03). She did the grocery shopping with her kids. (*Id.* at PageID.103).

Plaintiff's anxiety kept her from going out and interacting with people like she used to, she explained, also citing her changed appearance since her cancer treatment. (*Id.* at PageID.103). She did maintain one friendship, and very occasionally went out to a restaurant or the movies with her mother. (*Id.* at PageID.103-04). She used to like to paint. (*Id.* at PageID.104).

On a typical day, Plaintiff felt "[u]tterly and completely exhausted," as if she had not slept at all, so she laid down several times throughout the day for two or three hours at a time. (*Id.* at PageID.104-06). She estimated she got about four to six hours of sleep a night. (*Id.* at PageID.95). Plaintiff had tried to use sleeping aids, but they had made her "too groggy" to drive the next morning. (*Id.*).

In response to her complaints of fatigue, she said, the doctor had checked her thyroid, iron, and vitamin D levels. (*Id.* at PageID.106). The fatigue could also be due to

her fibromyalgia or Hashimoto's, which made her either hyperthyroid or hypothyroid and caused "extreme exhaustion," among other issues. (*Id.*). The medication she took for her thyroid worked, she explained, but the doctors were cutting her medication when she was hyperthyroid. (*Id.* at PageID.107). In addition, her thyroid issues caused brain fog, which made it hard for her to remember names, "a sequence of things," or a medication list, for example. (*Id.*). She needed to write everything down.

In addition, her anxiety often kept her from sleeping. (*Id.* at PageID.104). During panic attacks, her heart started racing, and she felt like she was dying. (*Id.* at PageID.104-05). They could be triggered, for example, by someone banging on her door. (*Id.* at PageID.105).

Plaintiff also briefly mentioned having coronary artery disease, (*id.* at PageID.104), and irritable bowel syndrome, (*id.* at PageID.107).

### vi. The Vocational Expert's Testimony at the Hearing

Vocational Expert (VE) James Fuller also testified. (*Id.* at PageID.109). He classified Plaintiff's past work as a store manager, a skilled job, classified at light but performed at medium. (*Id.* at PageID.110). The ALJ then posed his first hypothetical:

> [A]ssume an individual the claimant[']s age, education and work experience who is capable of doing work . . . at the light exertional level. Also limit to occasional[] climbing of stairs and ramps. No climbing of ropes, ladders and scaffolds. Furthermore, limit to occasional balancing, stooping, kneeling, crouching and crawling. Furthermore, limit to occasional overhead reaching bilaterally, avoiding concentrated exposure to unprotected heights, vibrating tools, moving machinery. Also limited to simple, routine and repetitive tasks. Tasks which require little judgement and can be learned in a short period of time. And also limit to occasional interaction with public, co-workers and supervisors.

17

(*Id.* at PageID.110). With those limitations, a person could not do Plaintiff's past work. (*Id.*). She could, however, work as an inspector (100,000 jobs nationally); sorter (120,000 jobs nationally); or in laundry jobs (100,000 jobs nationally). (*Id.*). If a sit-stand option were added, the same jobs would remain available, but reduced in number by 50 percent. (*Id.* at PageID.110-11).

Next, the ALJ returned to the limitations from the first hypothetical, but this time limited to work at the sedentary level. (*Id.* at PageID.111). The VE testified that work would be available as an inspector (30,000 jobs); in sorting jobs (35,000 jobs); and inassembly jobs (60,000 jobs). (*Id.*). Typical breaks were 15 minutes in the morning, 15 in the afternoon, and a 30-minute lunch. (*Id.*). No more than one absence a month would be tolerated; nor would more than 10 percent of time off-task. (*Id.*).

### F. Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017).[2] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§

---

[2] SSR 06-03p was rescinded effective March 27, 2017, and 20 C.F.R. § 404.1513 was updated as of March 27, 2017. The new regulation is effective for cases filed on or after March 27, 2017; because Plaintiff filed for benefits prior to March 27, 2017, I consider his case under the old rule.

404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id*. When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed her claim before March 27, 2017, she is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

The claimant must provide evidence establishing his or her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S.

20

at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

In accordance with SSR 16-3p, an ALJ must analyze the consistency of the claimant's statements with the other record evidence, considering his or her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *6 (March 16, 2016).

21

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016).

**G. Analysis**

Plaintiff argues remand would be appropriate on several grounds, including that the ALJ failed to compare the evidence before him to the evidence that formed the basis for the prior decision, as required by the regulations, (*id.* at PageID.1243-45); the ALJ did not adequately support his decisions to give less weight to Plaintiff's medical opinion sources and more to the state agency reviewers greater weight, (*id.* at PageID.1245-52); and that the ALJ failed to comply with SSR 16-3p in evaluating Plaintiff's symptoms, (*id.* at PageID.1252).

Defendant retorts that the ALJ properly determined Plaintiff's impairments had medically improved, appropriately assessed her subjective allegations, and accurately

22

evaluated the medical opinions in the record, and that the RFC crafted by the ALJ is supported by substantial evidence. (R. 21 at PageID.1270-1306).

I turn first to Plaintiff's argument that the ALJ failed to properly analyze her symptoms in accordance with SSR 16-3p. (R. 17 at PageID.1252-56). Essentially, Plaintiff makes the same argument as above, that the ALJ focused on normal objective findings from routine physical examinations, and did not grapple with the fact that Plaintiff reported muscle pain, fatigue, and migraines throughout the record.[3] In addition, Plaintiff asserts that her ability to do light chores and activities on some days "does not diminish the credibility of her symptoms[,] nor can it be conflated with the ability to maintain sustained employment." (*Id.* at PageID.1255).

Defendant responds that the ALJ recognized Plaintiff's diagnosis of fibromyalgia and found it a severe impairment, but properly considered the many unremarkable physical examinations in the longitudinal treatment record in deciding additional limitations were unwarranted. (R. 21 at PageID.1300-02).

---

[3] Plaintiff also raises a concern that the ALJ relied on a note of noncompliance from Plaintiff's therapist, but suggests "it seems reasonable to assume that Plaintiff missed her appointments due to her increased symptoms, which should not detract from her disability claim." (R. 17 at PageID.1253-54). Plaintiff is correct that an ALJ should not hold a claimant's failure to seek treatment against them without first considering evidence that she had a good excuse—for example, financial difficulties or mental impairments. Although it may be true that Plaintiff's symptoms kept her from attending her appointments, she did not offer any explanation of her absence—at least, none that appears in the record. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-84 (6th Cir. 2009). Thus, I suggest that it was not improper for the ALJ to consider the note of noncompliance in his analysis.

The Social Security Ruling on the evaluation of fibromyalgia describes it as "a complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2. The Sixth Circuit has recognized that "unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243-44 (6th Cir. 2007). For example, people with fibromyalgia "manifest normal muscle strength and neurological reactions and have a full range of motion." *Preston v. Sec'y of Health & Human Servs.*, 854 F.2d 815, 820 (6th Cir. 1988).

Still, as Defendant points out, a diagnosis of fibromyalgia alone is insufficient to prove disability. *See Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 806 (6th Cir. 2008) ("[A] *diagnosis* of fibromyalgia does not automatically entitle [the claimant] to disability benefits . . . .") (emphasis in original). "As with any claim for disability benefits," the Commissioner still "must ensure there is sufficient objective evidence to support a finding that the person's impairment(s) so limits the functional abilities that it precludes him or her from performing any substantial gainful activity." SSR 12-2p, 2012 WL 3104869, at *2.

Due to the nature of fibromyalgia, objective testing may be "of little aid or relevance" in determining the existence or severity of fibromyalgia. *Preston*, 854 F.2d at 820. SSR 12-2P explains that the ALJ should then follow SSR 96-7p's two-step credibility analysis to evaluate the claimant's personal statements about the severity of her own

24

symptoms.[4] At the first step, the ALJ looks for medical signs and findings that show the person has a medically determinable impairment that "could reasonably be expected to produce the pain or symptoms alleged. *Id.* At the second step, where "objective medical evidence does not substantiate the claimant's statements about the intensity, persistence, and functionally limiting effects of [her] symptoms," the ALJ should then consider "all of the evidence in the case record," including activities of daily living, medications and treatments, the nature and frequency of the claimant's attempts to obtain medical treatment, and so on. SSR 12-2p, 2012 WL 3104869, at *5 (July 25, 2012).

Both parties accurately represent the factual record. It is true that Plaintiff routinely reported muscle pain. *E.g.*, (R. 14 at PageID.377, 731, 782, 789, 792-93, 913, 916, 919, 1028, 1110, 1121-22, 1215). And rheumatologist Dr. Van Dellen regularly noted trigger points, beginning in June 2013, (*id.* at PageID.378) and then repeatedly over the next three years, into 2016 (*id.* at PageID.380, 382, 384, 386, 729, 732, 735, 737, 739). So too did rheumatologist Dr. Yahia, who in August 2016 remarked that Plaintiff "appears to have a severe case of fibromyalgia with exquisitely tender trigger points." (*Id.* at PageID.793-94). Dr. Yahia noted trigger points again in November 2016 and March 2017 (*Id.* at PageID.787, 790).

The record also contains no small amount of evidence that Plaintiff sought treatment for her muscle pain. Plaintiff saw a chiropractor more than 30 times between November

---

[4] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation remains materially unchanged, and requires the same two-step process described above. *see* 20 C.F.R. § 404.1529(c).

25

2015 and April 2017, (*id.* at PageID.798, 799, 804, 805, 806, 807, 811, 815, 816, 817 818, 820, 822, 823, 827, 828, 829, 831, 832, 833, 834, 835, 839, 840, 844, 845, 846, 847, 848, 849, 850, 851, 852, 856, 857), but frequently experienced exacerbations, *e.g.*, (*id.* at PageID.807, 818, 849). At her most recent appointment, in April 2017, she was still reporting constant neck and back pain, headaches, and pain radiating to the thigh, and the chiropractor noticed "a moderate level of pain and discomfort" on palpation at the occiput to C4, L4 to L5, and the sacrum bilaterally. (*Id.* at PageID.798).

Plaintiff also attempted to stanch her pain with various medications, which were repeatedly adjusted by her medical providers, including Dr. Van Dellen, (*id.* at PageID.378, 380, 734-46), and Dr. Yahia, (*id.* at PageID.787, 790, 794). At her most recent appointment in the record, in March 2017, Plaintiff reported she was "happy with" 300mg of Neurontin daily and Tramadol, but continued to have interrupted sleep, "fibro fog," fatigue, and migraines in the morning, as well as pain during physical activity (*Id.* at PageID.786). Dr. Yahia stopped Trazodone and increased her Neurontin dosage. (*Id.* at PageID.787).

It is also true that at numerous appointments with medical providers between June 2011 and March 2017, physical examinations revealed a normal range of motion in Plaintiff's joints, (*id.* at PageID.493, 495, 729, 732, 783, 787 (with some pain), 790); and normal range of motion in her neck, *e.g.*, (*id.* at PageID.378, 391, 395, 403, 411, 416, 418, 422, 427-28, 429, 435, 437, 439, 447, 450, 453, 455, 463, 552, 632, 640, 644, 1130, 1138, 1142, 1170), *cf.* (*id.* at PageID.584 (limited range of motion), 601-02 (limited range of motion), 739 (good range of motion in neck, but "irritable"), 882 (restricted range of motion)). Similarly, Plaintiff consistently demonstrated a normal gait. (*Id.* at PageID.493,

550, 555, 729, 732, 735, 750, 754, 762, 774, 783, 926, 929, 933), no sensory deficits, *e.g.*, (*id.* at PageID.391, 395, 403, 411, 416, 418, 422, 427-28, 429, 435, 438, 439, 446, 447, 450, 453, 455, 463, 495, 550, 552, 555, 632, 640, 644, 1130, 1138, 1142, 1170), and normal muscle strength, *e.g.*, (*id.* at PageID.391, 395, 403, 411, 416, 418, 422, 427-28, 429, 435, 438, 439, 446, 447, 449, 450, 453, 455, 463, 550, 552, 555, 632, 640, 644, 1130, 1138, 1142, 1170), *cf.* (*id.* at PageID.587, 601-02 (reduced strength)). And Plaintiff consistently had no peripheral edema. *E.g.*, (*id.* at PageID.391, 395, 403, 411, 416, 418, 422, 427-28, 429, 435, 438, 439, 446, 447, 450, 453, 455, 463, 493, 511, 512, 513, 514, 515, 516, 517, 552, 632, 640, 644, 1142, 1170);   *cf.* (*id.* at PageID.584 (edema), 790 (same), 926 (same), 1215 (same)).

The ALJ's analysis of Plaintiff's fibromyalgia, however, leaves much to be desired. He never mentions the Social Security Ruling on fibromyalgia explained above, SSR 12-2p; nor does he otherwise acknowledge that fibromyalgia is not susceptible to objective testing, or that patients with fibromyalgia can be expected to demonstrate normal muscle strength, no sensory deficits, and a full range of motion.

Most importantly, I can find no indication that the ALJ engaged in the required two-step credibility analysis of Plaintiff's fibromyalgia symptoms. The ALJ seems to have undertaken the first step, as he found that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the objective medical and other evidence for the reasons explained in this decision." (R. 14 at PageID.69).

27

And the ALJ did analyze some of Plaintiff's *other* symptoms—but not her muscle pain. For example, he gave only "some weight" to her testimony and function reports because they were not fully consistent with the record as a whole, since "[t]he medical evidence does not fully corroborate the allegations of excessive tiredness, swelling in the lower extremities, or numbness in in [*sic*] her extremities." (*Id.* at PageID.69). He stated that Plaintiff's allegations of "neurological deficits or swelling in the lower extremities" are belied by "relatively unremarkable" physical evaluations. (*Id.*). And he later explained that "the objective findings do not corroborate the claimant's allegations of disabling depression or anxiety," because "she is able to maintain her activities of daily living, care for her two teenage daughters, and drive." (*Id.* at PageID.72). But he never undertook even that much analysis for Plaintiff's fibromyalgia symptoms.

In cases involving fibromyalgia, "where subjective pain complaints play an important role in the diagnosis and treatment of a condition, providing justification for discounting a claimant's statements is particularly important." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007). Because the ALJ failed to provide that justification, I suggest remand is warranted so the ALJ may undertake the proper analysis of Plaintiff's symptoms of fibromyalgia.

This defect also implicates the ALJ's treatment of the three medical opinions from treating physician Dr. Bhardwaj, as his June 2014 and December 2015 opinions were based in part on "persistent and life-altering muscular pain," (R. 14 at PageID.625, 716), and his June 2017 opinion is based in part on Plaintiff's fibromyalgia and "severe pain" in "all muscles," (*id.* at PageID.1224). Here, the ALJ gave no weight to Dr. Bhardwaj's June 2014

opinion because "[t]he objective medical evidence does not corroborate persistent muscle pain," among other reasons, (*id.* at PageID.72), and gave little weight to his June 2017 opinion in part because of consistent normal physical examinations showing a full range of motion in the cervical spine, no cervical lymphadenopathy, no neurological deficits, and no edema in the lower extremities, (*id.* at PageID.72-73). The absence of irrelevant objective data is not a "good reason" for rejecting Dr. Bhardwaj's opinion on Plaintiff's fibromyalgia.

On remand, the ALJ might be able to explain why, in this case, the traditional forms of evidence are meaningful. Or he might have reason to discount relevant evidence—for example, if a close examination of the record reveals that this evidence is too entwined with dubious subjective complaints for the treating physicians to reasonably rely on it in their diagnoses and opinions. But the ALJ cannot reject these treating source opinions based on the normal physical examination results without considering whether those results are relevant in the context of the medically determinable impairments at issue, most importantly, fibromyalgia.

Because I suggest remand is warranted on the above basis, I need not reach Plaintiff's other arguments, and decline to do so.

### H. Conclusion

For the reasons stated above, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment, (R. 17), be **GRANTED**, the Commissioner's Motion for Summary Judgment, (R. 21), be **DENIED**, and this case be **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this Report and Recommendation.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

30

Date:  July 31, 2019                    S/ PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge